UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff              )
                                   )
       v.                          )   Case No. 2:02 cv 480
                                   )
FUNDS ON DEPOSIT AT BANK ONE,      )
INDIANA ACCOUNT 1563632726;        )
FUNDS ON DEPOSIT AT BANK ONE,      )
CHICAGO ACCOUNT 1110010428312;     )
FUNDS ON DEPOSIT AT US BANK        )
f/n/a FIRSTAR BANK ACCOUNT         )
422310164; FUNDS ON DEPOSIT AT     )
US BANK f/n/a FIRSTAR BANK         )
ACCOUNT 0196994842; FUNDS ON       )
DEPOSIT AT BANK CALUMET ACCOUNT    )
0008100973; FUNDS ON DEPOSIT AT    )
FIFTH THIRD BANK ACCOUNT           )
8930056316; UNIT 1B04, REAL        )
PROPERTY LOCATED AT 4250 N.        )
MARINE DRIVE, CHICAGO, ILLINOIS;   )
UNIT 424, REAL PROPERTY LOCATED    )
AT 4250 N. MARINE DRIVE, CHICAGO   )
ILLINOIS; UNIT 913, REAL           )
PROPERTY LOCATED AT 4250 N.        )
MARINE DRIVE, CHICAGO, ILLINOIS;   )
UNIT 628, REAL PROPERTY LOCATED    )
AT 4250 N. MARINE DRIVE, CHICAGO   )
ILLINOIS; US CURRENCY; DR. JONG    )
H. BEK,                            )
                                   )
            Defendants             )


                    OPINION AND ORDER

       This matter is before the court on the Motion for Summary

Judgment [DE 88] filed on November 13, 2009, by the plaintiff,

United States of America.  For the following reasons, the Motion

for Summary Judgment is GRANTED.

## Background

This is an in rem proceeding related to the charge and conviction of Jong Bek for the conspiracy to dispense and distribute controlled substances in violation of 18 U.S.C. §846, and 24 counts of illegally dispensing Schedule III or IV controlled substances. (See United States of America v. Bek, et al., Cause No. 2:03-CR-4, N.D. Ind.) At the government's request, the court takes judicial notice of the findings and holdings of the underlying criminal case.[1] To view the evidence presented in the light most favorable to the claimant, Bek, as the non-moving party, the court presents the undisputed facts as offered in the Statement of Undisputed Material Facts in Support of Government's Motion for Summary Judgment [DE 90] and those few facts relevant to this civil forfeiture matter declared by Bek in his "Direct Answer to No Legitimate Medical Reason." [DE 91-2] The vast majority of Bek's assertions in this document are aimed at the merits of the underlying criminal matter and cannot be considered here. However, the court will present Bek's statements which can be construed to be a defense to the forfeiture of the funds in question.

---

[1] See United States v. Stevens, 500 F.3d 625, 628-29 n.4 (7th Cir. 2007) (discussing a district court's right to take judicial notice of related proceedings as evidence, especially when the government's brief is supported by documentary evidence)(citing Opoka v. INS, 94 F.3d 392, 394 (7th Cir. 1996) (recognizing proceedings of state and federal courts as the proper subject of judicial notice). Here, the government's statement of facts was meticulously supported by documented evidence submitted as exhibits to the statement of undisputed material facts and the brief in support of the motion for summary judgment.

Between September 2000 and July 2002, the defendants in the criminal case - Bek (a physician), Leonard Tucker, Robert Dickerson, Duane Sier, James Sier (all pharmacists), and Richard Faloona (an employee of Bek) - conspired to distribute Schedule III and IV controlled substances outside the scope of professional practice and not for legitimate medical purposes. Bek dispensed prescriptions for the Schedule III and IV controlled substances to people who lacked a medical need for the drugs they were seeking. Bek would not accept patient appointments, requiring instead that patients (customers) line up outside his office building in Gary, Indiana. Faloona was employed by Bek from October 2001 until July 2002 as an office manager and was responsible for monitoring the daily patient/customer list and the order in which they saw Bek. Faloona would sign in the patients on a piece of paper which determined the order in which they would be "treated." Faloona also would coach patients on what to say to Bek in order to receive the controlled substance they were seeking. Bek would see several patients at the same time in one examination room where he would conduct a brief, sham examination of one patient/customer in the presence of the other patients. Patients paid Bek in cash at the end of the sham examination and Bek would provide the requested controlled substance. If the patient wanted a prescription refill for the controlled substance, Bek would charge double.

During the period covered by the conspiracy, Bek illegally dispensed and was held accountable for 913,887 units (pills) of

Schedule III and IV controlled substances.  Between September 2000 and July 2002, Bek wrote over 20,000 illegal prescriptions that were filled at 55th Avenue Pharmacy, Inc., which was owned by co-defendants Dickerson and Tucker.  From October 2001 through July 2002, Bek wrote over 10,000 illegal prescriptions that were filled at Washington Drug, which was owned by co-defendants Duane and James Sier.  Bek regularly saw 40-50 patients per day and, at times, as many as 80 patients during a single day. From as early as April 1999, Bek's patients paid $60.00 at the initial visit, $50.00 at each subsequent visit, and $100.00 if the prescription provided for a refill.  The only method of payment Bek accepted was cash, and he refused to allow patients to pay with insurance or medicaid.

As a general rule, the same patient would come back frequently, either weekly, every 10 or 14 days, or monthly.  Bek issued multiple prescriptions for controlled substances per visit.  From as early as April 1999, Bek dispensed prescriptions for the Schedule III and IV controlled substances to people who lacked a medical need for the drugs they were seeking.  Between August 1998 and July 2002, Bek conducted 21,997 patient visits at which Bek issued the one or more prescriptions for Schedule III and/or Schedule IV controlled substances.  The pattern of documenting these visits and the prescriptions was consistent throughout this time: reprinting or repeating the same patient progress notes and often patient temperature and blood pressure readings.

Between August 1998 and March 2002, Bek deposited the cash received from his patients primarily into two bank accounts at Bank One Chicago and Bank One Indiana. Sixty-nine (69) cash deposits totaling $892,940.00 were made into those two accounts during that period. On August 31, 1998, Bek opened Bank One Indiana Account Number 1563632726 ("Bank One Indiana account"). Bek was the sole account holder. The deposit slips show a pattern of deposits in round numbers occurring approximately every two to three weeks between August 31, 1998, and August 20, 2001. During this time period, Bek made sixty-four (64) cash deposits totaling $691,490.00. A total of $1,071,971.00 in checks was deposited into the Bank One Indiana account during the same time period.

Between November 15, 2000, and September 2, 2001, Bek made four withdrawals in the form of bank checks totaling $220,000.00 from the Bank One Indiana account and deposited the bank checks into his US Bank f/n/a Firstar Bank account number 422310164 ("Firstar 0164 account"). Between August 31, 1998, and February 8, 2000, Bek deposited $225,170.00 of drug sale proceeds and $387,258.00 in proceeds from unknown sources into his Bank One Indiana account. On February 8, 2000, Bek withdrew $95,000.00 in the form of a bank check from the Bank One Indiana account and deposited the bank check into his Bank Calumet account number 0008100973 ("Bank Calumet account"). Between August 31, 1998, and November 15, 2000, Bek deposited $420,720.00 in cash from drug sales and $911,326.00 in checks from unknown sources into

5

the Bank One Indiana account.  The Bank One Indiana account
balance as of December 4, 2002, was $535,061.28, which was
forfeited pursuant to a final order of forfeiture entered on
October 14, 2005, in the criminal case.

On October 17, 2001, Bek opened Bank One Chicago account
number 1110010428312 ("Bank One Chicago account").[2]  Bek is the
sole account holder of the Bank One Chicago account.  The deposit
tickets and transaction receipts show a pattern of deposits in
round numbers occurring approximately every two to three weeks
between October 17, 2001, and June 20, 2002.  Bek made twelve
(12) cash deposits into this account during this time frame
totaling $335,000.00.  On January 9, 2002, Bek also deposited
into this account a check in the sum of $140,314.60.  On February
6, 2002, Bek withdrew $30,000.00 in the form of a bank check from
the Bank One Chicago account and deposited it into his Firstar
Account number 0164 on the same date.  In addition, Bek made
several large withdrawals from the Bank One Chicago account, in-
cluding a January 9, 2002 check for $35,500.00 to Nancy Bek and
checks totaling $65,025.00 drawn on February 7, 2002, to Nancy

---

[2]The government's Motion [DE 88], Memorandum in Support [DE 89], and
Statement of Undisputed Facts [DE 90], repeatedly misname or confuse the bank
account numbers.  For example, the Statement of Facts, p. 9, refers to the
opening of the Bank One Chicago account - in bold, no less - in conjunction
with the Bank One Indiana account that was forfeited pursuant to the disposi-
tion of the criminal case.  Likewise, the short motion seeks in its prayer
forfeiture of the "funds on deposit in Bank One Chicago, Account #422310164,"
which is the account number of one of Bek's Firstar Bank accounts.  Fortu-
nately, the government's Motion, Statement of Facts, and Memorandum along with
the reams of bank documents filed as exhibits sufficiently enabled the court
to sort out the mistakes.

Bek, the Internal Revenue Service, and the Indiana Department of Revenue. The account balance at the time of seizure was $264,563.89.

On November 12, 1997, Bek opened Firstar Bank Account number 422310164 ("Firstar 0164 account"). Bek is the sole account holder. Between November 15, 2000, and September 2, 2001, Bek deposited four bank checks drawn on his Bank One Indiana account totaling $220,000.00 and deposited them into this Firstar 0164 account. The beginning balance in the Firstar 0164 account prior to the $40,000.00 deposit on November 20, 2000, was $12,453.00. The next deposit into the Firstar 0164 account was the $100,000.00 bank check drawn on the Bank One Indiana account on November 22, 2000, resulting in an account balance of $149,185.00. On November 29, 2000, a deposit of $12,000.00 from an unknown source was made into the Firstar 0164 account, and Bek withdrew $100,000.00 in the form of a check from the Firstar 0164 account and deposited the check into his Firstar 4842 account. The account balance after the $100,000.00 withdrawal was $55,356.00.

On November 29, 2000, Bek opened Firstar Bank Account Number 0196994842 ("Firstar 4842 account"). Bek is the sole account holder. Bek opened the Firstar 4842 account with a deposit of the $100,000.00 check drawn on Bek's Firstar 0164 account. No other deposits were made into the Firstar 4842 account between November 29, 2000, and March 25, 2002. Between November 29, 2000 and March 25, 2002, Bek made electronic fund transfers totaling

$20,956.00 from his Firstar 4842 account back into his Firstar 0164 account. Between November 29, 2000 and March 25, 2002, the Firstar 4842 account earned interest in the amount of $3,742.00. The account balance in the Firstar 4842 account as of the date of seizure was $83,839.59.

On February 14, 2000, Bek opened Bank Calumet Account Number 0008100973. Bek is the sole account holder. The Bank Calumet account was opened with a deposit of a bank check in the amount of $95,000.00 drawn on Bank One Indiana Account. The only subsequent activity in the account was the crediting of interest in the amount of $8631.00. The account balance in the Bank Calumet account on date of seizure was $104,455.03.

Bek made the following interbank transactions involving his six (6) accounts at Bank One, Firstar Bank, Bank Calumet and Civitas:[3]

    a. 12/28/99:   withdrew $30,000 from Bank One
                   Indiana Account and deposited
                   it into his Civitas Bank Ac-
                   count on 12/29/99

    b. 01/19/00:   withdrew $57,000 from Bank One
                   Indiana Account and deposited
                   it into his Civitas Bank Ac-
                   count on 01/21/00

    c. 02/08/00:   withdrew $95,000 from his Bank
                   One Indiana account and depo-

---

[3]Again, the government's statement of material facts and Exhibits 7C and 7D throws in information about a Civitas account without any clues to this account's relevance here. The court assumes that because the account number, 8930056316, corresponds with the Fifth Third Bank account number 8930056316, which is listed in the caption of this matter as one of the in rem items at issue, perhaps the Civitas and Fifth Third account are one and the same.

8

sited it into his Bank Calumet
account on 02/14/00

d. 11/15/00:    withdrew $40,000 from Bank One
Indiana account and deposited
it into his Firstar 0164 ac-
count on 11/20/00

e. 11/15/00:    withdrew $100,000 from Bank
One Indiana account and depos-
ited it into his Firstar 0164
account on 11/22/00

f. 11/29/00:    withdrew $100,000 from Firstar
0164 account and deposited it
into his Firstar 4842 account
on 11/29/00

g. 01/31/01:    withdrew $40,000 from Bank One
Indiana account and deposited
it into his Firstar 0164 ac-
count on 02/07/01

h. 08/31/01:    withdrew $40,000 from Bank One
Indiana account and deposited
it into his Firstar 0164 ac-
count on 09/04/01

i. 02/07/02:    withdrew $30,000 from Bank One
Chicago account and deposited
it into his Firstar 0164 ac-
count 02/11/02

These fund transfers were done by the issuance of bank checks in
the above stated amounts which were made payable to Bek or to the
transferee bank.

During the course of the consent search on July 23, 2002,
agents recovered $48,295.00 in U.S. currency in Bek's desk
drawer.  The U.S. currency was in thirteen (13) separate bundles
of various amounts and denominations of $1.00, $5.00, $10.00,
$20.00, $50.00, and $100.00 bills. Among the bundled money was
$180.00, consisting of nine (9) $20.00 bills, which bore the same

serial numbers as U.S. currency "buy money," used by three (3) undercover law enforcement officers for illegal prescriptions on June 25, 2002.

The government seeks forfeiture of the $48,295.00 in U.S. currency and the Bank One Chicago account as traceable proceeds of Bek's illegal activities, and forfeiture of the Firstar 4842 account and the Bank Calumet account as funds constituting property involved in money laundering offenses or traceable to such property under 18 U.S.C. §981(a)(1)(A).  Account number 1563632726 at Bank One Indiana was included in the Final Order of Forfeiture entered in the criminal matter.  The remaining bank accounts listed in the case caption, the Firstar 4842 account and the Fifth Third Bank account number 8930056316, were dismissed from this action by the government because of their de minimus value.  The government also dismissed the forfeiture action as to the real properties named.

Attempting to decipher only those statements relevant to the facts above, Bek adds:

> 12;  In the Court Judge Sharp said, "Which one is the biggest account?"  Prosecutor said, "Account 15636327726 at Bank One, Indiana, your Honor."  Judge Sharp said; "Then hold that account and let the others go, so we can pay the bills for expert witness, Lawyers and other expenses."  "And rest can be solved in Federal Civil Court."
>
> 13;  This statement is changed as "Forfeit account 1563627726 at Bank One, Indiana and rest to be settled in Federal Civil Court." in transcript.

* * *

15; Bek was accepting cash only. he was not taking medicare medicaid as a pay of office visit. therefore, Cash deposit was total gross income of Bek from the office based practice. Bek was not accepting checks from patients nor from insurance company. Insurance company are to pay the patients and Bek signed for that on insurance paper.

* * *

19; Susan Collins, Assistant Prosecutor lied during trial when she said that "Bek was making $900,000.00 per year every year, drug money". Such a large income was involved only in the year of 2000 and still most of these were from real estate. Copies of income tax return for several years were sent to Judge Sharp.

* * *

37; There were questions about transfer of money from one bank to another, by the government. The reason Bek did that was FDIC (federal deposit insurance company) has limitation of protecting amount. Therefore Bek was trying to diversify the fund for the protection with FDIC of each different Bank.

* * *

39; Government's charge against Bek's office visit charge $50 $60 per visit, According to medical economic magazine, that was average price for the doctor's out patient's visit at that time.

40; In the year of 2000, Bek's total income was near 872,998 and most are from sale of properties, $414.207 and $195,640. Bek sold 5x properties in that year. He put on advertisement on chicago tribune, and his wife Nancy Bek sold through telephone. And shared profit with her. Medical income of the year of 2000 was $219.559. Federal total tax payment was approximately $246.237.

41; IN the year of 1999, total income was $296,704 and medical income was $184,499

capital gain with property was $67,201 and rental income was $17, 534.

\* \* \*

49;  Bek was operating out patient Clinic for the profit and for his living and that was not for the Charity or non-for profit organization.  At that time, medicare or medicaid payment was not enough for Bek's bill payment to maintain office after change to HMO and managed care.

50;  By paying $100.00 for refill, patients got benefit also not having to make trip and drive, in some cases 1 hour drive for one way.  The number of these refill were small compare to total number of visits.  Bek was trying to reduce possible abuse.

\* \* \*

52;  Ethel Hardin was a Bek's Pt. for a many years as a medicaid Pt.  She was willing to pay for the visit when Bek terminated medicaid.  She sta[r]ted with $20.00 for visit and when Bek was asking $50.00 per visit she was not happy for that.  Bek's all other Pts were Paying $50.00 for visit and Bek was simply trying to be fair for everyone with same price.  [sic generally]

(DE 91-2, "Direct Answer to No Legitimate Medical Reason")

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Williams v. Excel Foundry & Machine, Inc., 489 F.3d 309, 310 (7th Cir. 2007); Treadwell v. Office of the Illinois Secre-

tary of State, 455 F.3d 778, 781 (7ᵗʰ Cir. 2006); Branham v. Snow, 392 F.3d 896, 901 (7ᵗʰ Cir. 2004). The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. Adickes v. S.H. Kress & Company, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); Lawrence v. Kenosha County, 391 F.3d 837, 841 (7ᵗʰ Cir. 2004). A fact is material if it is outcome determinative under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); Ballance v. City of Springfield, Illinois Police Department, 424 F.3d 614, 616 (7ᵗʰ Cir. 2005); Hottenroth v. Village of Slinger, 388 F.3d 1015, 1027 (7ᵗʰ Cir. 2004); Palmer v. Marion County, 327 F.3d 588, 592 (7ᵗʰ Cir. 2003). Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts. Spiegula v. Hull, 371 F.3d 928, 935 (7ᵗʰ Cir. 2004); Hines v. British Steel Corporation, 907 F.2d 726, 728 (7ᵗʰ Cir. 1990). Finally, summary judgment "will not be defeated simply because motive or intent are involved." Roger v. Yellow Freight Systems, Inc., 21 F.3d 146, 148 (7ᵗʰ Cir. 1994). See also Miller v. Borden, Inc., 168 F.3d 308, 312 (7ᵗʰ Cir. 1999); Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 346 (7ᵗʰ Cir. 1997); United Association of Black Landscapers v. City of Milwaukee, 916 F.2d 1261, 1268 (7ᵗʰ Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> Anderson, 477 U.S. at 250, 106 S.Ct. at 2511

See also Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."); Celotex Corp., 477 U.S. at 322-23, 106 S.Ct. at 2553; Branham, 392 F.3d at 901; Lawrence, 391 F.3d at 841; Hottenroth, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 573 (7th Cir. 2003). Summary judgment is appropriate in civil forfeitures where this standard is met. See, e.g., United States v. One 1987 Mercedes Benz 300E, 820 F.Supp. 248,

253 (E.D. Va. 1993)(granting summary judgment to government where there was no material issue of fact).

18 U.S.C. §981(a)(1)(A) provides for the forfeiture of "Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of this title, or any property traceable to such property." Actions brought under §981 are in rem and are prosecuted pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims. 18 U.S.C. §981(b)(2)(A).

The government filed this action pursuant to the civil forfeiture provision of the Controlled Substances Act, 21 U.S.C. §881(a)(6). This statute provides for the forfeiture of "[a]ll moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . . , all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate [such an exchange] . . . ." 21 U.S.C. §881(a)(6). Thus, any "cash hoard" may be subject to forfeiture if it represents the proceeds of an illegal drug transaction. United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d 448, 454 (7th Cir. 2005). Such a civil forfeiture is subject to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. §983(c)(1). CAFRA heightens the government's evidentiary burden in civil forfeitures - the government must demonstrate "by a preponderance of the evidence[] that the property sought is subject to forfeiture[.]" 18 U.S.C. §983(c)(1). Furthermore, "if the Govern-

ment's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  18 U.S.C. §983(c)(3).

However, when the government is proceeding on a proceeds theory, the government does not need to show a substantial connection between the currency or funds and a particular drug offense.  United States v. $118,170.00 in U.S. Currency, 69 Fed. Appx. 714, 717 n.1 (6th Cir. 2003); United States v. $47,550 U.S. Currency, 2007 WL 1032369, *7 (W.D. Mich. 2007); United States v. U.S. Currency Totaling $101,207.00, 2007 WL 4106262, *5 (S.D. Ga. 2007).  "It is sufficient if the circumstances establish by a preponderance of the evidence that the money came from the drug trafficking generally."  $47,550, 2007 WL 1032369 at *7.  The government may rely on a claimant's criminal conviction, including the basic principles of issue preclusion which apply, to establish forfeiture of the defendant property.  United States v. Approximately $25,829,681.00 in Funds, 2002 WL 143679, *3 (S.D.N.Y. 2002).

The government seeks forfeiture with respect to the $264,563.89 of funds in the Bank One Chicago account and the $48,295.00 seized from Bek's residence on the grounds that both are the proceeds of Bek's illegal drug activity, and thus subject to forfeiture pursuant to 21 U.S.C. §881(a)(6).  Because the funds deposited in the Bank One Chicago account constitute

16

fungible property, 18 U.S.C. §984 applies.  Accordingly, "it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property."  18 U.S.C. §984(a)(1)(A)-(B).  The government is not required to trace the money from its initial criminal origin to its ultimate location.  United States v. U.S. Currency Deposited in Account No. 1115000763247 for Active Trade Co., 176 F.3d 941, 947 (7th Cir. 1999).

Regarding the funds in the Bank One Chicago account, the government has shown in its undisputed statement of facts that Bek made $335,000.00 in deposits to this account in cash received from his illegal prescription mill.  Although other funds were deposited in the account from unknown and presumably clean sources, the remaining balance of $264,563.89 is less than the deposits from illegal sources and is subject to forfeiture.

Regarding the U.S. currency seized from Bek's home, the government has shown that the sham medical clinic run by Bek resulted in cash payments for the prohibited prescriptions.  The presence within this stash of $180.00 of marked "buy money" used by undercover law enforcement officers reinforces the criminal origin of these funds.

Nothing that Bek has stated in his objection refutes this evidence, and it corresponds with the facts found in the criminal case.  All of Bek's assertions which argue the legality of the

17

medical exams and the prescriptions have been rejected by a jury in the criminal trial and are not in dispute here. Bek states that he accepted only cash in his medical practice and that the amount he charged per patient was standard for a for-profit business organization, but the government convinced a jury that his medical practice was a criminal venture. Bek's declaration that he only earned larger sums of money in the year 2000, supported by his tax forms, similarly does not change the findings in the criminal trial.

The totality of the circumstances leads to the conclusion that it is more likely than not that the account and the cash is subject to forfeiture pursuant to 21 U.S.C. §881(a)(6) as moneys exchanged for a controlled substance. The government is entitled to the forfeiture of the $264,563.89 of funds in the Bank One Chicago account and the $48,295.00 seized from Bek's residence.

The government seeks forfeiture with respect to the Firstar 4842 account and the Bank Calumet account on the grounds that both are subject to forfeiture pursuant to 18 U.S.C. §981(a)(1)(A). This statute subjects forfeiture of "any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of this title, or any property traceable to such property." 18 U.S.C. §981(a)(1)(A). Specifically, the government alleges that the funds in both of these accounts were involved in money laundering transactions in violation of both Section 1956 and Section 1957.

Title 18, United States Code, Section 1957, provides in
pertinent part as follows:

> (a) Whoever, in any of the circumstances set
> forth in subsection (d), knowingly engages or
> attempts to engage in a monetary transaction
> in criminally derived property of a value
> greater than $10,000 and is derived from a
> specified unlawful activity, shall be pun-
> ished as provided in subsection (b).

> * * *

> (d) The circumstances referenced to in sub-
> section (a) are -

>> (1) that the offense under this
>> section takes place in the United
>> States . . . .

The term "monetary transaction" includes the deposit,
withdrawal, transfer, or exchange, in or affecting interstate or
foreign commerce, of funds by, through, or to a financial insti-
tution.  18 U.S.C. §1957(f)(1).  The term "criminally derived
property" means any property constituting, or derived from, pro-
ceeds obtained from a criminal offense. 18 U.S.C. §1957(f)(2).
The term "specified unlawful activity" has the meaning given to
that term in Section 1956 of Title 18, which includes violations
of the Controlled Substances Act. 18 U.S.C. §1957(f)(3); 18
U.S.C. §1956(c)(7)(A); 18 U.S.C. §1961(1).

Title 18, United States Code, Section 1956, provides in
pertinent part as follows:

> (a)(1) Whoever, knowing that the property
> involved in a financial transaction repre-
> sents the proceeds of some form of unlawful
> activity, conducts or attempts to conduct
> such a financial transaction which in fact

> involves the proceeds of specified unlawful
> activity -
>
> * * *
>
> > (B) knowing that the transaction is
> > designed in whole or in part -
> >
> > > (i) to conceal or disguise the
> > > nature, the location, the
> > > source . . . of the proceeds
> > > of specified unlawful activ-
> > > ity[.]

When the proceeds of a specified unlawful activity are commingled with funds from legitimate sources and withdrawals subsequently are made from the commingled account, the government is not required to trace the funds constituting criminal proceeds for purposes of establishing a violation of Section 1956 or Section 1957. See United States v. Haddad, 462 F.3d 783, 792 (7th Cir. 2006)(with respect to prosecutions under Section 1957); United States v. Jackson, 935 F.2d 832, 840 (7th Cir. 1991) (same with respect to Section 1956). See also United States v. Huber, 404 F.3d 1047, 1058 (7th Cir. 2005) (holding that both the speci- fied unlawful activity proceeds involved in a financial transac- tion, as well as any clean money commingled with it, constitute the corpus of money laundering transactions and both are subject to forfeiture); United States v. Moore, 27 F.3d 969, 976-77 (4th Cir. 1994)(where government alleges a Section 1957 monetary transaction originating "from a single source of commingled illegally-acquired and legally-acquired funds . . . , the govern- ment is not required to prove that no 'untainted' funds were involved, or that the funds used in the transaction were exclu-

sively from the unspecified unlawful activity"); United States v.
Johnson, 971 F.2d 562, 570 (10th Cir. 1992) (holding that the
government's burden of showing that the criminally derived
property used in monetary transactions was in fact derived from
specified unlawful activity does not require it to show that the
funds withdrawn from defendant's account could not have come from
any source other than the unlawful activity); United States v.
Sokolow, 91 F.3d 396, 408 (3rd Cir. 1996) (Section 1957 does not
require the government to "trace the funds constituting criminal
proceeds when they are commingled with funds obtained from
legitimate sources.").

Regarding the Firstar 4842 account, the government has shown
that the funds deposited originated from a $100,000.00 check
drawn on Bek's Firstar 0164 account. The Firstar 0164 account
received deposits in the form of four bank checks from Bek's Bank
One Indiana account totaling $220,000.00. The deposits to the
Bank One account constituted illegal cash proceeds from Bek's 64
cash deposits into that account totaling $691,490.00 and were
commingled with unspecified check deposits of $1,071,971.00. No
other deposits were made, though $20,956.00 was transferred back
to the Firstar 0163 account and interest accrued, leaving the
balance on the date of seizure as $83,839.59. Similarly, regard-
ing the Bank Calumet account, the government has shown that the
account was opened with the deposit of a bank check in the amount
of $95,000.00 drawn on the Bank One Indiana account. The en-
tirety of the Bank One Indiana account which was forfeited at the

21

close of the criminal matter was forfeitable under 18 U.S.C. §1956 because of the financial transactions that "involve" the proceeds of specified unlawful activity. See Huber, 404 F.3d at n.7. Accordingly, those funds transferred out of that account into others is forfeitable as well.

Bek's claim that the purpose for these fund transfers from account to account was to ensure FDIC insurance of his deposits does nothing to shield the transactions from the money laundering statutes, 18 U.S.C. §§1956 and 1957. Each and every withdrawal, deposit, and transfer moving the criminally derived funds constituted a transaction which violated the statute and supports forfeiture.

Therefore, the court GRANTS the motion for summary judgment regarding the $83,839.59 of funds from the Firstar 4842 account and the $104,455.03 of funds from the Bank Calumet account number 0008100973.

---

For the foregoing reasons, the Motion for Summary Judgment [DE 88] filed on November 13, 2009, by the plaintiff, United States of America, is GRANTED, and a forfeiture judgment is ENTERED on the $264,563.89 of funds from the Bank One Chicago account number 1110010428312, the $48,295.00 in U.S. currency seized from Bek's residence, the $83,839.59 of funds from the Firstar account number 0196994842, and the $104,455.03 of funds from the Bank Calumet account number 0008100973.

ENTERED this 9th day of March, 2010.


                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge